# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

KATHLEEN L. WATTS, ROBERT
NEWMAN, AND RYAN G. MILLER, on
behalf of themselves and all others similarly
situated,

          Plaintiffs,

    v.

TROY E. MEINK, SECRETARY OF THE AIR
FORCE, UNITED STATES OF AMERICA, in
his official capacity,

          Defendant.

Civil Action No. 1:25-cv-1093

**COMPLAINT**

## CLASS ACTION COMPLAINT FOR
## DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Kathleen L. Watts, Robert Newman, and Ryan G. Miller, on behalf of themselves and all others similarly situated, bring this action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, to address the failure of Defendant, the Secretary of the Air Force of the United States of America, acting by and through the Department of the Air Force, to comply with applicable law and U.S. Department of Defense regulations. Through this action, Plaintiffs challenge the Director of the Secretary of the Air Force's Pre-Integrated Disability Evaluation System ("Pre-IDES") screening process, as defined in Paragraphs 48-55 *infra*, as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## NATURE OF THE ACTION

1.    Plaintiffs and the members of the class they represent are former officers and enlisted personnel in the United States Air Force (collectively, "Service Members") who (a) were identified by an Air Force medical provider to suffer from a permanent, compensable and

definitive diagnosis which does not meet retention standards for continued military service per DoDI 6130.03 V2, DAFMAN 48-123, or the Medical Standards Directory ("MSD")," and (b) who were barred by Air Force instruction from accessing the disability evaluation process, Integrated Disability Evaluation System (IDES).

2.      Through this action, Plaintiffs challenge the Director of the Secretary of the Air Force's Pre-IDES process as detailed in Paragraphs 48-55, *infra*, and implemented and enforced by the Air Force in making final determinations on whether a service member should be referred into the military's IDES. Namely, the Pre-IDES screening process injured Plaintiffs and similarly situated service members by unlawfully denying individuals identified by Air Force medical personnel with potentially unfitting conditions (*i.e.,* conditions that fail retention standards) access to the uniform IDES process replete with specified rights that they are statutorily entitled to receive. Specifically, Section 1612 of 10 U.S.C. § 1071, requires that "[p]rocesses for medical evaluations of recovering service members… (i) apply uniformly throughout the military departments."[1]

3.      As a result of the Air Force's Pre-IDES screening process, Plaintiffs and similarly situated service members who were given final determinations and recommended to be returned to duty by the Air Force Personnel Center Medical Retention Standards Office (AFPC/DP2NP) or the equivalent Surgeon General's office (if Air Reserve Component "ARC") were improperly and unlawfully denied the opportunity to access the IDES process despite having potentially unfitting conditions. The Air Force's Pre-IDES screening process deprived service members of their

---

[1] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Sec. 1612. Medical evaluations and physical disability evaluations of recovering service members).

property interest in disability retirement benefits without the minimum due process required by law.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this putative class action pursuant to the APA.

5.      This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the laws governing the United States military and the APA.[2]

6.      Plaintiffs seek exclusively declaratory and other equitable relief.[3] Specifically, Plaintiffs request a declaration that the Air Force's Pre-IDES process is unlawful and an injunction requiring Defendant to refer each Plaintiff into the IDES for a full and fair evaluation. This evaluation should include referral for all conditions that led to the Pre-IDES referral, with Plaintiffs also given the opportunity to claim and have considered any additional physical or mental conditions. The evaluation should be conducted de novo, ensuring proper consideration of all relevant medical conditions, and any equitable relief flowing from that determination.

7.      An actual, justiciable controversy now exists between the class and Defendant, and the requested relief is proper under 5 U.S.C. §§ 701–706.

8.      In accordance with 28 U.S.C. § 2401, this action is brought within six years of the date that the Air Force denied Plaintiff's and class members' claims.

9.      Venue is appropriate in the United States District Court for the Eastern District of Virginia under 28 U.S.C. § 1391(e) because Defendant resides in Arlington, Virginia, and because the acts or omissions giving rise to this lawsuit took place in Virginia. Venue also is proper under 5 U.S.C. § 703 because this is a court of competent jurisdiction.

---

[2] *See* 10 U.S.C. § 1201(b); 5 U.S.C. §§ 701–706.
[3] *See* 5 U.S.C. § 702.

10.     The Air Force's Pre-IDES regulation results in a fitness determination that denies service member's entrance into the IDES after identifying that service members suffer from a permanent potentially unfitting condition. The Pre-IDES fitness determination constitutes final agency action taken by the Air Force Personnel Center Medical Retention Standards Office (AFPC/DP2NP) or the equivalent Surgeon General's office (if Air Reserve Component) for which there is no other adequate remedy.[4]

## PARTIES

11.     Plaintiff Kathleen Watts served as an Orthopedic Physician Assistant in the United States Air Force for approximately 12 years until June 1, 2023, when she separated from the Air Force.

12.     Plaintiff Ryan Miller served in the United States Air Force as an Aircraft Structural Maintenance Craftsman from January 2003 until November 2023, when he was removed from active duty and transferred to the Individual Ready Reserve.

13.     Plaintiff Robert Newman served as an Airborne Cryptologic Language Analyst ("CLA") in the United States Air Force from January 8, 2013, until December 23, 2023, when he completed his service contract and separated from the Air Force.

14.     Defendant Troy E. Meink is the Secretary of the United States Air Force, a statutory officer under 10 U.S.C. §9013.  Secretary Troy E. Meink is the head of the Department of the Air Force and is sued in his official capacity only.  This Complaint may interchangeably refer to the Defendant as the "United States," "Military," "Air Force," or "Defendant."

---

[4] *See* 5 U.S.C. § 704.

## FACTUAL ALLEGATIONS

### The Military Disability Evaluation System

15.    Sections 1602 and 1612 of 10 U.S.C. § 1071, as established by various National Defense Authorization Acts ("NDAAs"), require that service members with potentially unfitting conditions (*i.e.,* conditions that fail retention standards) be afforded a uniform IDES process replete with specified rights. Specifically, Section 1612 of 10 U.S.C. § 1071, requires that "[p]rocesses for medical evaluations of recovering service members … (i) apply uniformly throughout the military departments."[5]

16.    Chapter 61 of Title 10 of the U.S. Code establishes the process through which the U.S. Armed Forces may discharge disabled service members. It authorizes the Secretaries within the Department of Defense, including the Secretary of the Air Force, to discharge, or separate, those service members determined to be "unfit" to perform the duties of their office, grade, rank, or rating, due to physical or mental disability.

17.    Section 1602 of 10 U.S.C. § 1071 sets forth these uniform requirements, defining the IDES process as "[a] system or process of the Department of Defense for evaluating the nature and extent of disabilities affecting members of the Armed Forces that is operated by the Secretaries of the military departments and is comprised of medical evaluation boards, physical evaluation boards, counseling of members, and mechanisms for the final disposition of disability evaluations by appropriate personnel."[6]

18.    The Department of Defense has implemented these statutory requirements through U.S. Department of Defense Instruction ("DoDI") 1332.18 which establishes the Integrated

---

[5] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Sec. 1612. Medical evaluations and physical disability evaluations of recovering service members).
[6] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Sec. 1602. General definitions).

Disability Evaluation System ("IDES") and prescribes the overarching standards and procedures for conducting physical and mental disability evaluations.[7] The Air Force, in turn, has issued its own regulations detailing the procedures, Air Force Instruction ("AFI") 36-3212, which "prescribes guidance on retiring, discharging, or retaining service members who, because of a physical disability, are unfit to perform the duties required of them."[8]

19.    Section 1612 of 10 U.S.C. § 1071 requires that the military departments set out "[s]tandards for information for recovering service members, and their families, on the medical evaluation board process and the rights and responsibilities of recovering service members under that process, including a standard handbook on such information (which handbook shall also be available electronically)."[9]

20.    The IDES process begins when a service member's commander, the commander of the medical treatment facility treating the service member, or the service member's individual medical or dental officer refers the service member for medical evaluation.[10] A service member cannot self-refer to the DES.[11]

21.    The IDES consists of several stages of evaluation and review that result in a final fitness determination and disability rating for a service member.

---

[7] To facilitate the Court's review, Plaintiff has prepared a reference list of acronyms used in the military disability evaluation system and this Complaint as **Exhibit 1**, attached hereto.

[8] *See Keltner v. United States*, 165 Fed. Cl. 484, 488-89 (2023).

[9] *See* 10 U.S.C. § 1071 (Public Law 118-78, approved July 30, 2024) (Sec. 1612. Medical evaluations and physical disability evaluations of recovering service members).

[10] *See* Department of the Air Force, Department of the Air Force Manual 48-108: Physical Evaluation Board Liaison Officer (Peblo) Functions: Pre-Disability Evaluation System (Des) and Medical Evaluation Board (Meb) Processing (2021), https://static.e-publishing.af.mil/production/1/af_sg/publication/dafman48-108/dafman48-108.pdf.

[11] *See* DoDI 1332.1, Glossary.

22. The first component is a referral. The Department of Defense Instruction ("DoDI") 1332.18 and Department of Defense Manual ("DoDM") 1332.18, requires referral into the IDES when an authorized DoD medical authority determines that the service member may have a permanently unfitting condition.[12] A service member must be referred into IDES by an authorized DoD medical care provider "within 1 year of diagnosis," or earlier "[w]hen the course of further recovery is relatively predictable" upon the determination that the service member suffers from:[13]

> a. One or more medical conditions that may, singularly, collectively, or through combined effect, prevent the service member from reasonably performing the duties of their office, grade, rank, or rating, including those duties remaining on a Reserve obligation for more than 1 year after diagnosis;
>
> b. A medical condition that represents an obvious medical risk to the health of the member or to the health or safety of other members; or
>
> c. A medical condition that imposes unreasonable requirements on the military to maintain or protect the service member.

23. Following their IDES referral, a service member is sent for VA Compensation and Pension ("C&P") exams for their referred condition(s) and for all other conditions they choose to claim. The C&P examiner is charged with documenting the functional limitations of a service member's referred and claimed conditions.

---

[12] *See* DoDM 1332.18, §§ 4.2 (stating "[a]n authorized qualified DoD medical care provider, must … refer the service member to the IDES process"); DoDI 1332.18, §3.2(d), 5.2.
[13] *See* DoDI 1332.18, § 5.2.

24.     In the third step, a Medical Evaluation Board ("MEB"), a body of physicians, is convened to evaluate the service member's disability.[14]

25.     The MEB is a "process designed to determine whether a service member's long-term medical condition enables him/her to continue to meet medical retention standards, in accordance with military service regulations."[15] The MEB also documents the service member's full clinical history and the MEB's evaluation in a Narrative Summary ("NARSUM").[16] When the MEB determines that a "service "member cannot perform the duties of his office, grade, rank or rating the MEB refers the case to the (Physical Evaluation Board) PEB."[17]

26.     Section 1612 of 10 U.S.C. § 1071 requires that medical evaluations of recovering service members include:

    a.  Preparation of medical documents for recovering service members;

    b.  Independent Medical Review by an "appropriate health care professional who is independent of the medical evaluation board and can provide the service member with advice and counsel regarding the findings and recommendations of the medical evaluation board;

    c.  An appeal of medical evaluation board findings; and

---

[14] *See* DoDI 1332.18, Enclosure 2.
[15] *Medical Evaluation Board*, Health.Mil (Last Visited: Feb. 12, 2025), https://www.health.mil/Military-Health-Topics/Access-Cost-Quality-and-Safety/DES/Medical-Evaluation.
[16] *See* DoDI 1332.18, Enclosure 3, § 2(d), (f).
[17] *Id.* § 2(d).

     d.   Standards for information for recovering service members, and their families, on the medical evaluation board process and the rights and responsibilities of recovering service members under that process.[18]

27.    The PEB is the sole forum responsible for determining a service member's fitness for continued military service as a result of a physical or mental disability.[19] The PEB is comprised of two separate boards – an Informal Physical Evaluation Board ("IPEB") and a Formal Physical Evaluation Board ("FPEB").[20]

28.    Upon referral from the MEB, an IPEB, composed of two to three military personnel, is responsible for reviewing the evidence compiled by the MEB "to make initial findings and recommendations (regarding a service member's fitness) without the service member present."[21]

29.    The IPEB is responsible for determining whether the evaluated service member is "fit" and can be returned to duty,[22] or is unfit and must be retired or separated from the military due to disability. If the PEB finds that the service member is unfit for continued military service, then the PEB must assign a disability rating from 0% to 100%, in increments of 10%, to each physical or mental condition found by the PEB to render the service member unfit for continued military service.[23]

---

[18] *See* 10 U.S.C. § 1071 (Public Law 118-78, approved July 30, 2024) (Sec. 1612. Medical evaluations and physical disability evaluations of recovering service members).

[19] *Id.* at § 3(a).

[20] *Id.* § 3(b)–(c).

[21] *Id.* § 3(b).

[22] *See* 10 U.S.C. § 1211 (providing that when a service member is found physically fit to perform the duties of his office, grade rank or rating, they shall be "return[ed] to active duty); *see also* DAFMAN *See* DAFMAN 48-108, ¶ 2.2. (providing that the DES process is the proper way to determine if " a return to duty adjudication is appropriate.")

[23] *See* DoDI 1332.18, § 8, ¶¶ 7.7.i and 8.1d(3).

30.    A PEB's disability rating determines the type and amount of military benefits and services to which the service member is entitled upon discharge.

31.    A service member whose unfitting conditions are rated at a combined level of 30% or higher is deemed "medically retired" and is entitled to receive monthly disability payments in perpetuity, as well as rights to medical care from the military department and commissary privileges for the service member and his or her family.[24]

32.    In contrast, a service member who is assigned a rating between 0–20% is deemed "medically separated" and receives a one-time lump sum disability severance payment. 10 U.S.C. § 1212.[25] A service member who is "medically separated" is not entitled to the monthly disability payments or the medical care or commissary privileges for the service member and his or her family, to which a "medically retired" service member is entitled.

33.    A service member found unfit for duty is entitled to a hearing to appeal the IPEB's finding and request a personal appearance before a FPEB.[26] A hearing before the FPEB is authorized pursuant to Chapter 61 of Title 10 of the U.S. Code, which provides that "[n]o member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."[27]

34.    The FPEB is required to "convey the findings and conclusions of the board in an orderly and itemized fashion with specific attention to each issue presented by the member in regard to that member's case."[28]

---

[24] *See* 10 U.S.C. § 1203.
[25] *See* 10 U.S.C. § 1212.
[26] *See* 10 U.S.C. § 1214.
[27] *See* 10 U.S.C. § 1214.
[28] *See* 10 U.S.C. § 1222.

### Protections Guaranteed by IDES Referral And Processing

35.    It is "longstanding DoD policy" that "[t]throughout the IDES process, members of the Armed Forces are made aware of their due process rights and have access to legal counsel."[29]

36.    Congress reiterated this in the National Defense Authorization Act of 2023, requiring the military departments to create a policy that included "[a] restatement of the requirement that wounded, ill, and injured members of the Armed Forces may not be denied any due process protection afforded under applicable law or regulation of the Department of Defense or the Armed Forces."[30] This requirement arose out of Congress's "continued frustrations service members have with the lack of transparency and accountability in the process."[31]

37.    Additionally, Section 1612 of 10 U.S.C. § 1071, mandates that "in determining fitness for duty of a member of the Armed Forces under chapter 61 of title 10, United States Code... the Secretary concerned shall consider the results of any medical evaluation of the member provided under the authority of the Defense Health Agency[32] pursuant to section 1073c of title 10, United States Code."[33]

38.    Upon referral into the IDES, service members must receive a standardized multi-disciplinary briefing ("MDB"). This briefing is provided by Physical Evaluation Board Liaison

---

[29] Department of Defense, *Report to the Committees on Armed Services of the Senate and House of Representatives: Accountability for Wounded Warriors Undergoing Disability Evaluation* (2024 DoD Report), 5 (July 29, 2024), https://www.health.mil/Reference-Center/Reports/2024/03/28/Accountability-for-Wounded-Warriors-Undergoing-Disability-Evaluation.

[30] James M. Inhofe National Defense Authorization Act for Fiscal Year 2023 (NDAA of 2023), 117 P.L. 263, 2022 Enacted H.R. 7776, 117 Enacted H.R. 7776, 136 Stat. 2395, 117 P.L. 263, 2022 Enacted H.R. 7776, 117 Enacted H.R. 7776, 136 Stat. 2395.

[31] FY 2024 Joint Explanatory Statement of the Committee of Conference, www.armed-services.senate.gov/imo/media/doc/fy24_ndaa_joint_explanatory_statement.pdf.

[32] 10 U.S.C. § 1071(a)(4) (Through Public Law 118-78, approved July 30, 2024) (Accountability for wounded warriors undergoing disability evaluation)

[33] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Accountability for wounded warriors undergoing disability evaluation).

Officers ("PEBLOs"),[34] military services coordinators ("MSCs"),[35] and government legal counsel to explain each stage of the IDES process and to inform the service member of their responsibilities during the process.[36]

39.    Service members must be informed of their right to legal representation upon IDES referral.[37] They can choose either a military attorney at no cost to them or a civilian attorney at their own expense to help them navigate the IDES process and advocate on their behalf.[38] Additionally, "at the time of IDES referral, each military branch must be available to consult with a service member regarding their rights and elections, either by telephone or other means."[39] Finally, "service members are made aware of their right to have legal counsel throughout the IDES process to ensure … due process rights stay intact."[40]

40.    Since its creation in 2011, the IDES has required "a single set of disability medical examinations" for fitness determination by the Military Departments and disability ratings by the VA.[41]  The medical evaluations of recovering service members must be applied "uniformly throughout the military departments."[42]

41.    Moreover, the MEB must review all available medical evidence, including examinations completed as part of IDES processing, and document whether the service member

---

[34] PEBLOs manage expectations, coordinate medical appointments related to the disability process, and oversee the service member's case file.

[35] MSCs assist service members in the IDES with the VA claims process, case development, and notification of VA findings and proposed rating (DoDI 1332.18, Section 3, ¶ 3.9a).

[36] *See* DoDI 1332.18, § 2, ¶2.6i;  DoDI 1332.18, § 3, ¶3.4b.

[37] *See* DoDI 1332.18, § 4, ¶ 4;  DoDI 1332.18, § 3, ¶ 3.4a.

[38] *See* DoDI 1332.18, § 4, ¶ 4.

[39] *See* DoDI 1332.18, § 3, ¶ 3.4a.

[40] *See* DoDI 1332.18, § 3, ¶ 3.2e(4).

[41] *See* DoDM 1332.18, § 2, ¶ 2.6(j).

[42] National Defense Authorization Act for Fiscal Year 2008 ("NDAA of 2008"), 110 P.L. 181, 122 Stat. 3, 441.

has medical conditions that may prevent them from reasonably performing their duties.[43] Moreover, "IDES examinations must … be sufficient to assess the Service member's claimed condition(s)" in addition to those conditions that cause their referral into the IDES.

42.    Upon the service member's request, an impartial physician or other appropriate healthcare professional independent of the MEB will be assigned to review the MEB findings and recommendations and advise the service member on whether these findings adequately reflect the complete spectrum of their injuries and illnesses.[44] After receiving the impartial medical review report, the service member will have the opportunity to consult with legal counsel during the election period to either concur with or submit a written rebuttal to the MEB's findings.[45] Service members are entitled to submit a written rebuttal challenging the MEB's findings.[46] Upon receiving a MEB rebuttal, a physician or other medical provider will address the rebuttal, and the MEB will document evidence presented in the rebuttal, either amending the MEB or explaining why the original findings remain valid.[47]

43.    After the MEB, service members are afforded several additional critical protections at the PEB stage. Upon receipt of their IPEB findings, a service member may accept the findings, submit a rebuttal, or request an FPEB if found unfit.[48] During the FPEB hearing, service members have the right to have their case considered by board members who did not participate in the IPEB decision, appear in person or via videoconference, and be represented by government-appointed military counsel or civilian counsel at no expense to the government.[49] They may also make a

---

[43] *See* DoDI 1332.18, § 3, ¶ 3.a(1).
[44] *See* NDAA of 2008, § 1612.
[45] *See* NDAA of 2008, § 1612(a)2D; DoDI 1332.18, Section 3, ¶ 3.2e(5).
[46] *See* DoDI 1332.18, § 3, ¶ 3.2e(6).
[47] *See* DoDM 1332.18, § 4, ¶ 4.6c.
[48] *See* DoDI 1332.18, Section 3, ¶ 3.3b(1).
[49] *See* DoDI 1332.18, Section 3, ¶ 3.3c.

sworn or unsworn statement and access all records and evidence used in their case.[50] The National

Defense Authorization Act of December 27, 2021, P.L. 117-81, Div. A, Title V, Subtitle C, § 524,

135 Stat. 1687, mandates that the military Secretaries, including the Secretary of the Air Force,

must "ensure that a member of the Armed Forces may submit a formal appeal with respect to

determinations of fitness for duty to a Physical Evaluation Board of such Secretary," including "an

impartial hearing on a fitness for duty determination to be conducted by the Secretary concerned"

and "the option to be represented at a hearing by legal counsel."[51]

### The Air Force's Pre-IDES Screening Process Challenged in This Action.

44.    The Air Force's unlawful Pre-IDES screening process begins when a qualified

physician identifies a "Trigger Event," defined, in relevant part, as a medical or mental health

condition that is inconsistent with retention standards.[52] Trigger Events include, but are not limited

to, situations where a medical provider identifies that a service member suffers from "a definitive

diagnosis which does not meet retention standards for continued military service per DoDI 6130.03

V2, DAFMAN 48-123, or the Medical Standards Directory ("MSD")."[53] It is important to note

that is the exact standard that requires referral into the IDES. Once a Trigger Event is identified,

the Pre-IDES process begins with the service member's referral to a preliminary Aerospace

Medicine Review Optimization ("AMRO") Board.[54]

---

[50] *See* DoDI 1332.18, Section 3, ¶ 3.3c(5)(d).
[51] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Appeals to Physical Evaluation Board determinations of fitness for duty).
[52] *See* DAFMAN 48-108, ¶ 2.3.
[53] *See* DAFMAN 48-108, ¶ 2.3.
[54] An AMRO Board is "comprised of a team of medical professionals that meet at least monthly to review service members with a duty limiting condition that affects mobility, retention, or long-term physical fitness." DAFMAN 48-108.

45.    Upon referral to a preliminary AMRO Board, an Air Force PEBLO compiles the member's service treatment records, NARSUM, and latest duty-limiting AF Form 469 (physical profile) for review by the AMRO Board.[55] Once this documentation is complete, a Preliminary AMRO Board decides whether a service member should be returned to duty or assigned an Assignment Availability Code ("AAC") 37, a code that indicates a potential pending MEB/PEB.[56]

46.    AMRO Boards "should initiate a code 37 immediately upon determination that a service member does not meet retention standards."[57] In making such a decision, the AMRO Boards are required  to "utilize retention standards as outlined in DoDI 6130.03, Volume 2, Medical Standards for Military Service: Retention, DAFMAN 48-123, Medical Examinations and Standards,  and  its accompanying Medical Standards Directory ("MSD"), for retention standards determinations."[58]

47.    Once an AAC 37 is assigned, the second step in the Pre-IDES process, an Initial Review In Lieu Of ("IRILO"), is required.  When the IRILO package, which includes a service member's medical records and a commander's statement, is completed and submitted to the AMRO Board, the AMRO Board must then recommend either a full IDES processing or the service member's return to duty within 30 days.[59]

48.    The AMRO Board's recommendation, however, does not end the Pre-IDES screening process.  All final dispositions are made by Air Force Personnel Center Medical Retention Standards Office ("AFPC/DP2NP") or the equivalent Surgeon General's Office ("ARC

---

[55] *See* DAFMAN 48-108, ¶ 2.4.
[56] *See* DAFMAN 48-108, ¶ 2.3.4.2.
[57] *See* DAFMAN 48-108, ¶ 2.3.4.2.
[58] *See* DAFMAN 48-108, ¶ 1.2.4.
[59] *See* DAFMAN 48-108, ¶ ¶ 2.4.2, 2.4.3.

equivalent SG's office") – for reservists – within 10 calendar days.[60] AFPC/DP2NP or ARC equivalent SG's office disposition may result in referral into DES or a return to duty decision. Moreover, once issued, the Air Force claims that an "AFPC/DP2NP or ARC equivalent SG's office determinations are final" and have the same effect and authority as an MEB. [61]

49.    However, under DoDI 1332.18, only the PEB is authorized to make a fitness determination, not the MEB. If the AFPC/DP2NP decision had the same authority as the MEB, service members would not be returned or duty or referred to a MEB. Service members would instead be referred to a PEB for a fitness finding. As such, the fitness finding by AFPC/DP2NP is a final determination equivalent to a PEB finding.

50.    While AFPC/DP2NP or ARC equivalent SG's office determination are final, many service members will attempt an unofficial appeal via letter or via their physician and/or congressman.  Unlike appeals submitted as part of the IDES process, no further explanation or response is required by the Air Force.

**The Air Force's Pre-IDES Screening Process is Unlawful**

51.    The Air Force's Pre-IDES screening process is unlawful because it violates statutory law, specifically Sections 1602 and 1612 of 10 U.S.C. § 1071 and DoDI 1332.18 (2014). Congress unequivocally mandated that each military department implement a comprehensive, standardized IDES process to ensure uniformity and fairness for service members facing potentially unfitting medical conditions.  Beyond violating this statutory mandate for uniformity, the Air Force's Pre-IDES process systematically fails to provide the minimum protections required under both federal law and DoD instructions, including: timely referral into DES, counseling and

---

[60] *See* DAFMAN 48-108, ¶ 2.4.4
[61] *See* DAFMAN 48-108, ¶ 3.1.1.2.

briefing upon learning that a condition may be unfitting, access to free military counsel,[62] a full and fair MEB process including an IMR and an opportunity to appeal; and a PEB process and Post-PEB appeal process that meets statutory and regulatory standards. The Air Force's failure to follow the procedures and to provide the protections required under 10 U.S.C. § 1071 and DoDI 1332.18 cannot be justified by the Air Force's decision to label its initial IDES stage "the Pre-IDES process." Efficiency, however well-intentioned, must yield in the face of explicit Congressional instruction" requiring the IDES process to provide counseling, appellate opportunities, a right to an independent medical review and access to information."[63]

53. To enact the requirements of Chapter 61 of Title 10, the Department of Defense implemented the DoDI 1332.18 and DoDM 1332.18, which set forth the minimum procedures and protections to be followed in referring service members into the IDES.[64] In order for a military department's fitness decision to be lawful, it must be derived through procedures that meet the minimum requirements of DoDI 1332.18 and DoDM 1332.18.[65] DoDI 1332.18 requires referral into the DES when a service member appears to have one or more conditions that may permanently fail or be inconsistent with retention standards. In contravention of DoDI 1332.18, Air Force regulation DAFMAN 48-108 mandates that when a provider recognizes a trigger event, which includes "conditions or occurrences which may indicate a service member has a medical or mental health condition that is inconsistent with retention standards or deployability," the provider must

---

[63] *See* DAFMAN 48-108, ¶ 3.1.1.2.
[64] *See* DoDI 1332.18; *and see* DoDM 1332.18.
[65] *See Environmentel, LLC v. FCC*, 661 F.3d 80, 85 (D.C. Cir. 2011) (holding that the Court will not "hesitate to overturn agency action as arbitrary and capricious if the agency fails to 'comply with its own regulations.'"

take steps for "preliminary presentation at the next scheduled AMRO Board meeting," rather than referral into the DES.

54.     Once a service member has been identified as having at least one potentially unfitting condition, the law mandates that the MEB portion of the IDES process, not the Pre-IDES screening process, is triggered. However, the Air Force's Pre-IDES screening process cannot lawfully stand in place of a MEB or PEB because the Air Force's Pre-IDES screening process lacks the protections required by the 10 U.S.C. § 1071 and DoDI 1332.18.

55.     Specifically, the Pre-IDES process violates service members' rights to counsel and proper notification upon being identified as having at least one condition that fails retention standards. Under DoDI 1332.18 and DoDM 1332.18, service members facing an MEB are entitled to: (1) Clear notification that they are being referred for disability evaluation; (2) Information about the process and their rights; (3) Access to free military counsel at all stages.[66]

56.     In contrast, service members referred into the Pre-IDES process are entitled only to: (i) identification of the medical or mental health standard that is the primary reason for referral to the AMRO Board; (ii) information about the AMRO Board process, (iii) the potential outcomes of the AMRO Board; (iv) a target date for presenting the IRILO to the AMRO Board; and (v) the name and phone number of the PEBLO who will assist in the collection of required documents for the AMRO Board Review.[67]

57.     The Pre-IDES process fails to provide the protections guaranteed by 10 U.S.C. § 1071 and DoDI 1332.18 during the MEB, including: (i) a comprehensive medical evaluation of a service member's VA Compensation & Pension examinations and the service member's

---

[66] *See* DoDI 1332.18, Section 4.
[67] *See* DAFMAN 48-108 ¶ 2.3.2.

treatment records, (ii) access to free military counsel;  (iii) an impartial medical review; and (iv) a MEB rebuttal and adjudication.

58.    The Pre-IDES process also violates Section 1612 of 10 U.S.C. § 1071, which mandates that "in determining fitness for duty of a member of the Armed Forces … the Secretary concerned shall consider the results of any medical evaluation of the member provided under the authority of the Defense Health Agency."[68] Every service member proceeding through the IDES process receives a DHA-authorized medical evaluation that includes a "general medical examination" or "other applicable medical examinations that meet VA compensation examination standards for a service members referred and claimed conditions .[69]

59.    In contrast, the Air Force Pre-IDES process fails to provide a similar exam.[70] DAFMAN 48-108 only requires the AMRO Board to send pre-existing medical documents to a Service Medical Treatment Facility or medical retention standards office to review the member's referred conditions for fitness for duty. Service members cannot request consideration of other conditions that may be duty-limiting during the Pre-IDES process.

60.    Even though the Pre-IDES process results in a fitness finding, e.g. a return to duty, the Air Force's Pre-IDES screening process fails to provide the basic appellate protections required at the PEB by the National Defense Authorization Act of December 27, 2021, P.L. 117-81, Div. A, Title V, Subtitle C, § 524, 135 Stat. 1687. The statute mandates that the Secretary concerned must (1) "ensure that a member of the Armed Forces may submit a formal appeal with respect to

---

[68] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Accountability for wounded warriors undergoing disability evaluation).
[69] *See* DoDI 1332.18, Section 3.1e.
[70] See DAFMAN 48-108, 1.2.4. (stating "[t]he AMRO Board is comprised of a team of medical professionals that meet at least monthly to review service members with a duty limiting condition that affects mobility, retention, or long-term physical fitness. (emphasis added)."

determinations of fitness for duty to a Physical Evaluation Board of such Secretary; (2) The appeals process shall include, at the request of such member, an impartial hearing on a fitness for duty determination to be conducted by the Secretary concerned; and (3) Such member shall have the option to be represented at a hearing by legal counsel."[71] Despite these legal requirements, service members in the Pre-IDES process can be found fit for [72]duty without any opportunity to appeal.

61.    The Air Force's Pre-IDES screening process also fails to provide the appellate protections required after a Formal PEB by the National Defense Authorization Act of December 23, 2022, P.L. 117-263, Div. A, Title VII, § 711, 136 Stat. 2395, 2701. Specifically, a Pre-IDES finding cannot be appealed to an appellate authority designated via either written appeal or a hearing at which they may be represented by legal counsel.

62.    Finally, the Air Force's Pre-Integrated Disability Evaluation System (Pre-IDES) process lacks mandatory quality assurance ("QA") reviews by external entities, a deficiency that violates Department of Defense Instruction ("DoDI") 1332.18. This instruction requires each Military Department and the Defense Health Agency ("DHA") to conduct QA reviews to monitor and assess the accuracy and consistency of Medical Evaluation Boards ("MEBs") and Physical Evaluation Boards ("PEBs"), as well as the proper performance of related duties. By not implementing these external QA reviews, the Air Force retains control over its statistics and error rates. This lack of transparency and external oversight compromises the integrity of the Disability Evaluation System ("DES") and may result in inconsistent or unjust outcomes for service members. Moreover, without external QA reviews, there is no independent verification of the Air Force's internal assessments, increasing the risk of unaddressed errors and biases affecting service

---

[71] *See* 10 U.S.C. § 1071 (Through Public Law 118-78, approved July 30, 2024) (Accountability for wounded warriors undergoing disability evaluation).

[72] This is missing the citation.

members' evaluations. In summary, the absence of required external QA reviews in the Air Force's Pre-IDES process not only violates DoDI 1332.18 but also undermines the fairness, transparency, and effectiveness of disability evaluations, potentially leading to unjust outcomes for service members.

### Kathleen Watt's Denial of IDES Referral Resulting From Pre-IDES Screening

63.    Ms. Kathleen Watts served in the Air Force for almost 12 years as an Orthopedic Physician Assistant.

64.    In her last year of service, Ms. Watts began experiencing unexplained numbness, visual changes, and headaches.

65.    In February 2023, Ms. Watts was diagnosed with papilledema at an optometry appointment.

66.    She was immediately scheduled for an emergent Magnetic Resonance Imaging ("MRI"), which revealed findings highly suspicious for dural venous thrombosis. An MRI with contrast confirmed dural venous thrombosis at the junction of the left transverse and sigmoid sinuses, as well as right-sided transverse sinus stenosis with possible additional dural venous thrombosis at the junction of the right transverse and sigmoid sinuses, or Cerebral Venous Thrombosis ("CVT"). CVT occurs when a blood clot in the brain's venous sinuses prevents blood from draining out of the brain. As a result, pressure builds up in the blood vessels, which may lead to swelling and bleeding in the brain.[73]

67.    Ms. Watts was started on anticoagulant medication, which allowed for gradual, mild improvement of symptoms. However, even with treatment, she continued to experience

---

[73] *Cerebral Venous Sinus Thrombosis*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/cerebral-venous-sinus-thrombosis (last visited Feb. 11, 2025).

significant duty-limiting headaches (later diagnosed as migraines) and worsening intracranial pressure.

68.    Due to these chronic migraines, continued abnormal intracranial pressures, and the need for lifelong anticoagulation, Ms. Watts was placed on medical hold to postpone her March 1, 2023 discharge so that she could undergo a primary AMRO Board and then an IRILO. As part of her IRILO, a referral form was created, indicating that she would need treatment with likely lifelong anticoagulant and completion of workup through hematology for the diagnosis. The referral form also noted that frequent visits would limit time at work and restriction in physical exertion would limit many facets of her military occupation. Her prognosis indicated that her conditions would not improve enough in the next 12 months to allow her to perform all duties for her rank or position.

69.    Ms. Watts' treating physician provided documentation that due to her CVT, she required mobility restrictions through at least March 15, 2024, specialty medical care, and frequent monitoring.

70.    Her medical profile noted that she was restricted from participating in the 1.5-mile run assessment, high aerobic multi-shuttle run, 2 kilometers walk assessment, push-up assessment, hand release push-ups, sit-up assessment, cross-leg reverse crunch, planks, unit PT, and even from exercising at her own pace/distance until at least March 5, 2024.

71.    Her physician concluded that her CVT and associated migraines would not improve enough in the next 12 months for her to perform all duties of her office, grade, rank, or rating.

72.    On March 27, 2023, Ms. Watts' commander filled out a Commander's Statement for her IRILO, which indicated she could perform all her in-garrison duties and without the need for workarounds, limitations, schedule modifications, or restrictions.

73.    Ms. Watt's commander did note that her new condition may prevent deployment to austere locations, and she had limitations on computer screen time and no more than 12 hours of work per day.

74.    The Commander's Statement focused on historical data (prior to her CVT diagnosis) showing she only required 5 appointments over the last 12 months.

75.    No mention was made of her need for specialty care and frequent monitoring that would require frequent absences from duty, or her requirement for lifelong anticoagulant medication.

76.    Moreover, her commander indicated he did not consult with Ms. Watts' physician, because the "impact of the member's condition seems self-evident." Ms. Watts' commander concluded that Ms. Watts should be retained.

77.    Ms. Watts responded to her commander's statement by noting that since her diagnosis one month prior, she had missed 3 days of work, left early 4 days due to ongoing symptoms, and had 3 additional appointments.

78.    On April 19, 2023, an AMRO Board reviewed Ms. Watts' IRILO package and recommended her return to duty. On April 25, 2023, she was returned to duty.  All limitations on her current Air Force Form 469 (Physical Profile) were carried over. Her new profile also indicated that she required a waiver for assignments to  locations outside the United States and to a location without a fixed intrinsic military treatment facility or Tricare network available.

79.    On May 15, 2023, Ms. Watts informally submitted a written appeal of the IRILO determination. Her appeal indicated that as a result of her CVT, she experienced debilitating headaches 3 to 4 times per week requiring her to lay down in a dark room, resulting in her missing 2 to 3 days of work per week since her CVT diagnosis.

80.    Ms. Watts' neurologist wrote a letter for her appeal regarding her migraine headaches, stating that since her CVT drainage, she continued to have prostrating migraine-like headaches causing economic disability multiple times a week. Her neurologist explained that it was common to have refractory headaches even with clot resolution for months to years following a sinus thrombosis and that she continues to require multiple specialty care visits including neurology and hematology.

81.    Ms. Watts' hematologist also wrote a letter for her appeal, indicating that despite anticoagulation treatment, Ms. Watts continued to struggle with persistent migraine-type headaches, fatigue, and eye strain that interfered with her activities of daily living and duty performance.

82.    Following her appeal, Ms. Watts continued treatment, and her physicians documented her increasing symptoms, including moderate to severe migraine-type headaches with positive light sensitivity, mild dizziness, and mild to moderate generalized weakness.

83.    She was prescribed Botox for her migraines and she reached back out to the physician responsible for her IRILO documentation stating that under Air Force Regulations, migraines requiring Botox failed retention standards and required an IRILO.

84.     Then, on May 25, 2023, the AFPC/DP2NP, the AMRO Board's decision returned Ms. Watts' case "without action" asking the medical facility where she worked for a statement addressing any restrictions or limitations to her (hospital) privileges.

85.    On May 25, 2023, the Chief of Medical Staff at Eglin Air Force Base wrote that Ms. Watts had no "restrictions, limitations, or reductions *in privileges* (emphasis added)."

86.    The AFPC/DP2NP, subsequently upheld the AMRO Board's return to duty.

87.     Returned to duty without access to IDES processing, Ms. Watts continued to seek care for her migraines and intracranial pressure through discharge.

88.     A follow-up MRI scheduled shortly before her discharge showed "increased flattening with diminutive appearance of the transverse sinuses with questionable stenoses … (that) may also represent worsening idiopathic intracranial hypertension." As a result of these scans, Ms. Watts' neurologist stated that "[t]aken all together, her condition is unstable and requires multiple visits with multiple specialists. As such, she requires complete continuity of care without interruption at a minimum for potential permanent vision loss."

89.     On June 1, 2023, Ms. Watts separated from the Air Force. The day after her separation, her treating neurologist, Dr. Jonathan Thomas, drafted a memorandum noting that since her diagnosis in February 2023, Ms. Watts "continued to have prostrating migraine-like headaches causing economic disability multiple times a week. She continues to require multiple specialty care visits including neurology and hematology. Hematology informed her she will require lifelong anticoagulation (blood thinners). For her headaches, she has required injectable therapies (Botox). Recent repeat neuroimaging has indicated interval worsening of intracranial pressure, potentially leading to permanent vision loss. The ongoing plan was to continue to track her vision with ophthalmology, continue anticoagulation, and continue treating her severe headaches. If the clot and vision worsened, neurosurgical intervention would need to be considered."

90.     Dr. Thomas expressed extreme concern, noting that Ms. Watts "had a medically complex condition that was at risk for causing permanent blindness with no handoff in care." He further indicated that he called the Air Force Personnel Center twice to express his concerns and

was informed that active duty service members like Ms. Watts are ineligible for an MEB when their credentialing is unaffected.

91.    Still concerned, Dr. Thomas contacted two colonels involved in Ms. Watts' IRILO, who informed him that she would be "taken care of by the VA" and that the Air Force did "not need to use any more resources on her."

92.    Dr. Thomas reiterated that Ms. Watts "developed multiple disabling and duty-limiting conditions while on active duty and required injection-based therapies (Lovenox & Botox). Moreover, these conditions are dynamic and apparently worsening and could lead to blindness. I am concerned as her doctor as she was released from active duty without a medical evaluation board or any plan for continuity of care."

### Ryan Miller's Denial of IDES Referral Resulting From Pre-IDES Screening

93.    Mr. Ryan Miller served in the Air Force as an Aircraft Structural Maintenance Craftsman ("AFSC 2A773") from January 2003 until November 2023. As an Aircraft Structural Maintenance Craftsman, Mr. Miller was responsible for operating hand tools, shop equipment, machinery, motor vehicles and the performance of administrative duties.

94.    Mr. Miller first began to experience low back pain in April 2016 when he was deployed. His pain worsened with bending, lifting, and was non-responsive to dry needling.

95.     In September 2016, an MRI imaging study of Mr. Miller's L-Spine was performed that revealed one of the discs in his lumber spine is bulging and causing the space where nerves exit the spine to become narrower.  In addition to the MRI findings, Mr. Miller was diagnosed with right to left scoliotic curve of spine, right shoulder/left ilium elevated and increased lumbar lordosis.

96.     On or around January 2022, despite his undergoing spinal adjustments, lumbar decompression/traction, cold laser therapy, and a home exercise program, Mr. Miller's back pain became duty limiting along with his bilateral shoulder and neck pain.

97.     In light of his ongoing pain, Mr. Miller was placed on a physical profile that prohibited him from performing abdominal crunches or push-ups, from bending, stopping or climbing, from standing more than 12 hours and from carrying, dragging, lifting, pulling and pushing more than 40 pounds.

98.     Following his placement on profile, Mr. Miller spent the next seven months corresponding with his Chief regarding the possibility of IDES processing.

99.     On August 15, 2022, he was informed by his Chief that an AMRO Board had been requested.

100.    Then, on August 27, 2022, Mr. Miller was informed that an AMRO Board discussing his case would likely meet on September 10 and 11, 2022.

101.    On September 14, 2022, Mr. Miller's was told by the AMRO Board that the Board needed his records from January 2022 forward because the Board did not "see anything that would stop you from being retained." Mr. Miller informed his Chief that he did not have any more recent documentation as he had provided the Board will all current documentation.

102.    In response, Mr. Miller's chief informed Mr. Miller that the Board had "put a pause on the process" and that his case would be reviewed in October 2022.

103.    On October 25, 2022, Mr. Miller was informed by his Chief that a NARSUM was being assembled to present to the AMRO Board.

104.    On November 17, Mr. Miller's Chief reached out to Mr. Miller to let him know that his NARSUM was being worked on and to let Mr. Miller's know that he did not need a command statement unless "the IRILO finds you not fit for retention."

105.    On December 5, 2022, Mr. Miller was "found fit and was returned to duty" by the AMRO Board.

106.    Upon his return to duty, Mr. Miller was given several restrictions:

a.  He could only participate in unit training assemblies and annual tours within the continental United States, and only at locations with fixed medical treatment facilities.

b.  He was not allowed to hold duty assignments under field conditions, or occupy a mobility position.

c.  Mr. Miller was also prohibited from participating in unit physical training, including sit-ups, push-ups, and hand release push-ups.

d.  He was told to avoid prolonged standing, repeated bending at the waist, crawling/stooping, carrying all required deployment baggage, lifting more than 40 pounds, and working more than 12 hours per day.

e.  Mr. Miller was required to be re-evaluated no later than December 31, 2024.

107.    On December 14, 2022, Mr. Miller's Chief asked Mr. Miller to drill in January to comply with his fitness requirements. When Mr. Miller stated that his profile restricted certain activities, his Chief informed him that Mr. Miller was exempt from "push-ups and sit-ups but clear to run and have his waist measured. No mention was made about his being unable to repeatedly bend, carry baggage, lift greater than 40 pounds.

- 28 -

108.    From December 14, 2022 until June 4, 2023, Mr. Miller worked with his private attorney in an attempt to informally appeal the AMRO findings, including by sending a letter to his Congressman.  During this time, he did not attend drill as he believed his case was under review.

109.    Then, on June 4, 2023, Mr. Miller was asked by a sergeant from his unit if he was coming to drill.  When Mr. Miller followed up with his unit, he was informed that he would have to attend drill as he did not have a duty restriction. Mr. Miller's Chief then informed him that his pending appeal did not matter with regards to drill.

110.    On July 10, 2023, Mr. Miller followed up with his Chief to remind him that his enlistment was up in December 2023.  His Chief informed him the command was tracking and "if it takes that long for the (appeal) process to finish, you would likely be extended for due process."

111.    Mr. Miller then continued not to attend drill, under the belief that his case was still under appeal with 920th Aerospace Medicine Squadron.

112.    However, on August 9, 2023, Mr. Miller was informed that he had no appeal pending at the AMRO and as he had been found fit for duty with limitations on December 5, 2022.

113.    Mr. Miller did not have the opportunity to submit additional documentation or to have his case re-reviewed by the AMRO Board, because in November 2023 he was removed from active duty and transferred to the Individual Ready Reserve, where he is ineligible to receive DES processing.

### Robert Newman's Denial of IDES Referral Resulting From Pre-IDES Screening

114.    Mr. Robert Newman served in the U.S. Airforce from January 8, 2013 until December 23, 2023 as a CLA.

115.    CLAs employ foreign language skills to collect, transcribe, translate, analyze, and report intelligence information. Some CLAs operate onboard aircraft in flight.

116.    While deployed to Greece in 2017, Mr. Newman experienced a traumatic flight where he believed he was going to die. After his deployment, Mr. Newman began to experience heightened anxiety and stress.

117.    Initially it did not limit his duty-performance because post- deployment he served in a position that did not require him to fly. However, in February 2022, he was informed he would return to flying status and his "heart started racing thinking about returning to flying … and how I could die."

118.    Mr. Newman's symptoms worsened, and on April 4, 2022, when Mr. Newman filled out a Periodic Health Assessment, he requested assistance with stressors that were the "cause of significant concern or make it difficult for you to do your work, take care of things at home, or get along with other people." When the Air Force reviewed his Periodic Health Assessment, Mr. Newman was placed on Duties Not Including Flying ("DNIF") status.

119.    Mr. Newman remained in DNIF status for over a year, and in June 2023, he was referred by his primary care manager for a "fitness for duty evaluation/NARSUM" because he had been in specialty care and in DNIF status for over 12 months.

120.    As part of his IRILO package, Mr. Newman's Company Commander filed an Impact Statement For Medical Evaluation Board. According to his commander, Mr. Newman was disqualified from flight service, and could therefore only perform ground duties. Mr. Newman's commander further indicated that Mr. Newman "had [a] significant in-flight event that led to severe anxiety associated with his flight duties."

121.    Despite these admissions, and the fact that Mr. Newman was an airborne CLA who could not do his job while grounded, Mr. Newman's commander indicated that Mr. Newman's condition "has not been a concern for his work performance."

122.    Mr. Newman's commander also indicated that Mr. Newman's separation date from the Air Force was December 23, 2023. Ultimately, Mr. Newman's commander concluded in his commander's statement that Mr. Newman met retention standards because he had been able to serve in a role outside his Military Occupational Specialty.

123.    As part of his IRILO package, a NARSUM was completed by a military physician, which indicated that Mr. Newman "endorses all the symptoms of Post-Traumatic Stress Disorder ("PTSD") via Post Traumatic Stress Disorder Checklist ("PCL-5") scoring today. Particularly problematic are the following: avoidance of thinking about past traumas, emotional/physical reactions when exposed to cues of trauma, problems with going to sleep and staying asleep "even if I feel tired, I just won't be able to go to sleep easy … nightmares … flashbacks … cognitive distortions."

124.    The physician concluded that Ms. Newman "had been DNIF'ed [Duties Not Including Flying] for >1 year and is unlikely to … return in the near future. He is not WWQ [Worldwide Qualified] now nor expected to be in the near future. He has fairly prominent mental health symptoms that impact some of his functioning but is able to maintain close relationship. Reportedly able to do some aspects of his job from the ground as it was indicated in commander's impact statement, he was able to take on additional role of 1st Sgt Duties." The physician stated that even with treatment, Mr. Newman would be unable to improve enough over the next 12 months or even the next three years to meet all the requirements of an Airborne CLS.

125.    On August 24, 2023, Mr. Newman was returned to duty with an Assignment Limitation Code ("ALC"). The AMRO Board decided to return Mr. Newman to duty because an AMRO Board member "discussed [Mr. Newman's case] with my senior flight surgeon (Torres), it

seems more a fear of flight than a trauma issue.  I question about the diagnosis of PTSD here …
member should be considered to RTD [Return To Duty]."

126.    After his return to duty, Mr. Newman was placed on a profile that required a waiver
for any permanent change of station, temporary deployment, or deployment outside of the
continental United States, or if at a location without a fixed intrinsic military treatment facility or
Tricare Network.

127.    Denied IDES processing, Mr. Newman continued to seek mental health care until
his separation in December 2023.

## CLASS ACTION ALLEGATIONS

128.    Plaintiffs Kathleen Watts, Robert Newman, and Ryan Miller bring this action
pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of
similarly situated individuals.

129.    Plaintiffs seek to represent a class of all veterans of the United States Air Force who
were identified by a military medical authority as having at least one potentially unfitting
condition, a "Trigger Event," where the medical authority determined that the service member had
a definitive diagnosis that did not meet retention standards under applicable Air Force regulations
but did not receive access to IDES between starting on at least 2019 and continuing to present.

130.    This action has been brought and may properly be maintained as a class action
under federal law. It satisfies the numerosity, commonality, typicality, and adequacy requirements
for maintaining a class action under Fed. R. Civ. P. 23(a).

131.    On information and belief, there are at least 100 people in the proposed Class, and
the class members are identifiable using the records maintained in the ordinary course of business
by Defendant. Joinder is impracticable because the class is numerous.

132.    A common question of law and fact exists as to all members of the proposed Class:

> Whether the Air Force's referral of service members deemed to have one or more conditions that fail relevant medical retention standards into the Pre-IDES process, not the DES process, is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and without observance of procedures required by law.

133.    Defendant is expected to raise common defenses to these claims, including denying that the Air Force's actions were in violation of the law.

134.    Plaintiffs' claims are typical of the members of the Class because plaintiffs and all class members are injured by the same wrongful acts, omissions, policies and practices of Defendant as described in this Complaint. Plaintiff's claims arise from the same policies, practices and course of conduct that give rise to the claims of the class members and are based on the same legal theories.

135.    Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class. Plaintiffs have no interests adverse to the interests of the proposed class. They have retained *pro bono* counsel with experience and success in class action and veterans' matters. Counsel for Plaintiff knows of no conflicts among members of the Class or between counsel and members of the Class.

136.    Defendant has acted on grounds generally applicable to all members of the Class, and this action seeks declaratory and injunctive relief. Plaintiff therefore seeks class certification under Rule 23(b)(2).

137.    In the alternative, the requirements of Rule 23(b)(1) are satisfied because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of contact for the party opposing the proposed Class.

**COUNT I**
**Violation of APA, 5 U.S.C. § 706(2)(B) –**
**Contrary to Constitutional Right, Power, Privilege, or Immunity**

138.    Plaintiffs reallege and incorporate here paragraphs 1-137.

139.    10 U.S.C. § 1201 confers a property interest protected by the Due Process Clause because such benefits are nondiscretionary and statutorily mandated.[74] The Due Process Clause of the Fifth Amendment requires the federal government to provide persons in jeopardy of loss of a property interest with certain procedural safeguard.

140.    Since potential eligibility for disability retirement benefits confers a property interest, it follows that due process "imposes constraints" on the Air Force's ability to deprive service members of their potential disability retirement benefits.[75]

141.    Section 1602 of Title 10 U.S.C. § 1071 defines the IDES process as including "medical evaluation boards, physical evaluation boards, counseling of members, and mechanisms for the final disposition of disability."

142.    More specifically, at a minimum, the Constitution requires notice and some opportunity to be heard. However, service members in the Pre-IDES process are given no notice once found to have at least one potentially unfitting condition,  nor are they offered an opportunity to be heard via written appeal or formal hearing once denied IDES processing.

143.    As a result, Defendant's Pre-IDES process deprives service members of their property interest in disability retirement benefits without the minimum due process required by law. This denial of due process not only violates the Fifth Amendment of the Constitution, but it is arbitrary, capricious and contrary to law because it is contrary to 10 U.S.C. § 1071's mandate that

---

[74] *See Kelly v. United States*, 69 F.4th 887, 900 (Fed. Cir. 2023).
[75] *See Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).

the secretaries of the military departments may not deny "any due process protection afforded under applicable law or regulation of the Department of Defense or the Armed Forces."

144.    Under the Administrative Procedure Act ("APA"), this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be … contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

<u>**COUNT II**</u>
**Violation of the APA, 5 U.S.C. § 706(2)(A) –**
**Arbitrary and Capricious, Abuse of Discretion, Not in Accordance with Law**

145.    Plaintiffs reallege and incorporate here paragraphs 1-143.

146.    Defendant's conduct in developing and administering its Pre-IDES screening process was arbitrary and capricious, constituted an abuse of discretion, and was otherwise not in accordance with law.

147.    Defendant's actions pursuant to the Pre-IDES in depriving Plaintiffs from accessing the IDES system, in turn denying them the full and fair determination guaranteed by law as to whether they are entitled to military medical retirement, as described above, were arbitrary and capricious, constituted an abuse of discretion, and were otherwise not in accordance with law.

148.    Defendant's Pre-IDES screening process is arbitrary, capricious, and contrary to law because it violates the provision of the DoDI that requires prompt referral into the IDES upon determining a service member suffers from a condition that may be permanently inconsistent with retention standards.

149.    As a direct result of the Air Force's unlawful Pre-IDES screening process, Plaintiffs are deprived of the IDES system that is, by law, guaranteed to them when Plaintiffs are forced to follow Defendant's arbitrary and capricious Pre-IDES process.

150.    Under the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## COUNT III
### Violation of the APA, 5 U.S.C. § 706(2)(C) – Agency Action Short of Statutory Right

151.    Plaintiffs reallege and incorporate here Paragraphs 1-149.

152.    10 U.S.C. § 1602 and § 1612 requires that service members with potentially unfitting conditions (*i.e.,* conditions that fail retention standards) be afforded a uniform IDES process replete with specified rights. Section 1612 of 10 U.S.C. § 1071, requires that "[p]rocesses for medical evaluations of recovering service members … "(i) apply uniformly throughout the military departments."

> Section 1602 of 10 U.S.C. § 1071 sets forth these uniform requirements, defining the IDES process as "[a] system or process of the Department of Defense for evaluating the nature and extent of disabilities affecting members of the Armed Forces that is operated by the Secretaries of the military departments and is comprised of medical evaluation boards, physical evaluation boards, counseling of members, and mechanisms for the final disposition of disability evaluations by appropriate personnel."

153.    The Air Force's creation of the Pre-IDES screening process, which creates barriers to access for the IDES system is only used in this branch, runs blatantly afoul of the uniformity mandate set forth in 10 U.S.C. § 1071 by creating additional steps in the mechanism for the final disposition of disability.

154.    The Air Force's development of the Pre-IDES screening process also violates the express mandate of Section 1602 of 10 U.S.C. § 1071, which defines the IDES process as including "medical evaluation boards, physical evaluation boards, counseling of members, and mechanisms for the final disposition of disability."

155. Under the APA, this Court has authority to "hold unlawful and set aside agency action, findings, and conclusions found to be … short of statutory right," 5 U.S.C. § 706(2)(C). Specifically, the Air Force's Pre-IDES procedures violate federal law and fail to meet the standards set out in Department of Defense regulations.

**<u>COUNT IV</u>**
**Violation of APA, 5 U.S.C. § 706(2)(D) –**
**Agency Action Without Observance of Procedure Required By Law**

156. Plaintiffs reallege and incorporate here paragraphs 1-154.

157. Section 1612 of 10 U.S.C. § 1071 mandates that "in determining fitness for duty of a member of the Armed Forces under chapter 61 of title 10, United States Code … the Secretary concerned shall consider the results of any medical evaluation of the member provided under the authority of the Defense Health Agency pursuant to § 1073c of title 10, United States Code." As challenged here, a Pre-IDES determination functions as a fitness determination. That is, a return to duty after a member's fitness is called into question is actually a fitness determination.

158. The Air Force's Pre-IDES screening process comprised final agency action, which did not follow the procedures required by applicable law as it violated the express mandate of Section 1612 of 10 U.S.C. § 1071 by permitting service members found to have one or more conditions that permanently fail retention standards to be returned to duty—found fit—without the procedural protections guaranteed through the IDES process, including an Independent Medical Review by an appropriate health care professional who is independent of the medical evaluation board and can provide the service member with advice and counsel regarding the findings and recommendations of the medical evaluation board; an appeal of medical evaluation board findings; and standards for information for recovering service members, and their families, on the medical evaluation board process and the rights and responsibilities of recovering service members under that process.

159.    By making a fitness determination outside of IDES—without the procedural protections required by 10 U.S.C. § 1071 and DoDI 1332.18—the Air Force circumvents the law.

160.    Defendant's actions pursuant to the Pre-IDES in depriving Plaintiffs from accessing the IDES system, in turn denying them the full and fair determination guaranteed by law as to whether they are entitled to military medical retirement, as described above, resulted in agency action without the observance of procedure required by law. *See* 5 U.S.C. § 706(2)(D).

## PRAYER FOR RELIEF

Plaintiffs and the class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies and practices of Defendant, as alleged herein, unless Plaintiffs and the class they represent are granted the relief they request.

WHEREFORE, Plaintiffs and Class Members respectfully request that this Court enter judgment in their favor and against Defendant providing the following relief:

A.    Certify this Complaint as a Class Action;

B.    Designate Ms. Kathleen Watts, Mr. Robert Newman, and Mr. Ryan Miller as Class Representatives;

C.    Designate Plaintiff's Counsel of Record as Class Counsel;

D.    Declare that the Pre-IDES administered by Defendant since at least 2019 violated statutory law and DoD Instructions;

E.    Declare that the Defendant's use of its Pre-IDES screening process, resulting in the denial of disability retirement benefits to Plaintiffs and Class Members for their unfitting medical conditions was arbitrary, capricious, an abuse of discretion, and not in accordance with law;

F.    Order that service members who are determined by an authorized medical provider to suffer from a potentially unfitting medical condition must be referred into the IDES process;

G.      Order that the Director of the Secretary of the Air Force repeal the Pre-IDES screening process;

H.      Order that the Director of the Secretary of the Air Force conduct an evaluation of all service members whose cases were closed by an AMRO Board's evaluation.

I.      Retain jurisdiction of this case until Defendant has fully complied with the orders of this Court;

J.      Award Plaintiffs attorneys' fees and costs incurred in bringing and maintaining this action pursuant to 28 U.S.C. § 2412, and other applicable authorities; and

K.      Grant Plaintiffs and Class Members such other and further relief as the Court may deem necessary and appropriate.


[Signature Block Follows]

DATED this 1st day of July, 2025.


Respectfully Submitted,

**PERKINS COIE LLP**

*/s/ Alec W. Farr*
Alec W. Farr, VSB No. 99142
AFarr@perkinscoie.com
700 Thirteenth Street, N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: +1.202.654.6200
Facsimile: +1.202.654.6211

Thomas J. Tobin, *Pro Hac Vice* Application Forthcoming
Ttobin@perkinscoie.com
1301 Third Avenue, Suite 4200
Seattle, WA 98101
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000

*Attorneys for Plaintiffs*
*Kathleen L. Watts, Robert Newman, and Ryan G. Miller, on*
*behalf of themselves and all others similarly situated*